IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **CP HOLDINGS, INC.,** | ) | Case No. 04-635-CV-W-GAF |
| **I.D. No. 39-1614233,** | ) | |
| | ) | |
| Debtor. | ) | |

## ORDER

Presently before the Court is an Appeal by the Debtor, CP Holdings, Inc. ("CP Holdings"), challenging a final order entered by the United States Bankruptcy Court for the Western District of Missouri in Bankruptcy Case Number 03-43750, Doc. #212. (Doc. #1). In that Order, Bankruptcy Judge Arthur B. Federman overruled CP Holdings' objection to a claim filed by the California Public Employees' Retirement System ("CALPERS"). CP Holdings objected to CALPERS' claim on the basis that the prepayment premium included in CALPERS' claim was really a penalty and not compensation for actual loss. After carefully considering the briefs submitted by the parties and the Bankruptcy Court's findings of fact and conclusions of law, this Court finds that the Bankruptcy Court did not err in overruling CP Holdings' objection to CALPERS' claim for the prepayment premium. Accordingly, the judgment of the Bankruptcy Court is AFFIRMED.

**I.     Background**

At issue in this Appeal is the construction and legal effect of a prepayment penalty clause following a debtor's filing of Chapter 11 bankruptcy. On August 8, 1989, CP Holdings executed a Secured Promissory Note ("Note") with Principal Mutual Life Insurance Company in the amount of $12 million.

1

(Doc. #212, Bankr. Case No. 03-60942). Principal Mutual Life Insurance Company subsequently assigned this Note to CALPERS. Id. This Note is secured by mortgages on three commercial real properties located in Missouri, Maryland and Michigan. (Doc. #5, #9). The Note provides that CP Holdings agrees to pay a prepayment penalty in the event CALPERS accelerates the Note:

> The undersigned agrees that if the holder of this Note accelerates the whole or any part of the principal sum evidenced hereby or applies any proceeds as if such application had been made as a result of such acceleration pursuant to the provisions of the two mortgages and a deed of trust . . . the undersigned waives any right to prepay said principal sum in whole or in part without premium and agrees to pay a prepayment premium.

(Debtor's Ex. 5). The formula used to calculate the prepayment penalty is also included in the Note and it is the greater of one percent of the principal balance or the reinvestment yield minus the present value of the mortgage:

> Said premium to be the greater of one percent (1%) of the principal amount to be prepaid or a premium which is calculated as follows:
>
> (a) Determine the "Reinvestment Yield." The Reinvestment Yield will be equal to the yield on the U.S. Treasury Issue described below ("primary issue")* published two weeks prior to the date of prepayment and converted to an equivalent monthly compounded nominal yield.
>
> (b) Calculate the "Present Value of the Mortgage." The Present Value of the Mortgage is the present value of the regularly scheduled payments to be made in accordance with the note (all regular debt service payments and/or any balloon payment) discounted at the Reinvestment Yield for the number of months remaining from the date of prepayment to loan maturity. In the event of a partial prepayment, the Present Value of the Mortgage shall be calculated in accordance with the preceding sentence multiplied by the fraction which results from dividing the amount of the prepaid proceeds by the principal balance of the loan immediately prior to prepayment.
>
> (c) Subtract the amount of the prepaid proceeds from the Present Value of the Mortgages as of the date of prepayment. The resulting differential shall be the "Premium."
>
> * As a result of there being no U.S. Treasury Issue comparable to this Note on the date

hereof, the holder of this Note shall choose a comparable Treasury Bond, Note or Bill which the holder of this Note deems to be similar to the primary issue's characteristics (i.e., rate, remaining time to maturity, yield) at the time of prepayment.

On April 18, 2003, CALPERS declared the entire outstanding balance on the Note accelerated and immediately due and payable in full. (Doc.#5, #9). CP Holdings does not contest the acceleration. Id. CALPERS calculated the prepayment premium due under the Note by first determining the Reinvestment Yield to be 3.875%, the yield of a ten-year Treasury issue published on March 31, 2003 (which was two weeks prior to the date of acceleration). Id. CALPERS then converted the yield on the ten-year Treasury issue to a monthly yield of 3.8687%.[1] Id. Pursuant to the prepayment premium formula, CALPERS then discounted the remaining monthly payments due at the date of acceleration by the monthly Treasury yield to reach a present value of the scheduled remaining monthly payments in the amount of $11,102,760.49. Id. Finally, CALPERS subtracted the scheduled principal balance for April 1, 2003 in the amount of $8,451,212.80 to calculate a prepayment premium in the amount of $2,651,547.69.[2] Id.

On June 13, 2003, CP Holdings filed a voluntary Chapter 11 petition. Id. No portion of the debt due under the Note has been prepaid. Id. On October 14, 2003, CP Holdings objected to CALPERS proof of claim arguing that CALPERS alleged prepayment premium should be disallowed because it does not bear any reasonable relationship to CALPERS' actual damages. (Doc. #81, Bankr. Case No. 03-60942). On April 30, 2004, Judge Federman held a hearing on CP Holdings' objection to CALPERS

---

[1] The yield on the ten-year Treasury issue must be converted to a monthly yield because Treasuries are paid on a semi-annual basis. (Hr'g Tr. 146:8-11).

[2] CALPERS initially calculated that it was owed a prepayment premium of $2,620,731.32, which it later amended to $2, 651,547.69. (Doc. #5).

3

proof of claim. (Doc. #211, Bankr. Case No. 03-60942).

Both parties presented expert witnesses at this hearing. These experts testified about the purpose of prepayment premium clauses, their prevalence in commercial lending and the reasonableness of the prepayment premium clause included in the Note. CALPERS' expert also testified about the intention of the parties to calculate the prepayment premium from the date of acceleration, rather than the date of actual prepayment.

The Bankruptcy Court began by finding that "the acceleration was completed prior to the bankruptcy filing, thus, the language of the Note determined the amount of the claim prior to the bankruptcy filing." (Doc. #212, Bankr. Case No. 03-60942). Accordingly, the provisions of Bankruptcy Code § 506(b) do not apply because this Section "is only relevant for determining the amount of a claim post petition." Id. The Bankruptcy Court held that the "prepayment premium is provided for under the parties' agreement, and, based on the testimony offered, it was a reasonable estimate of the damages to be suffered in the event CALPERS lost the benefit of its bargain due to default." Id. The Bankruptcy Court concluded its Order by finding that both expert witnesses testified that "the United States Treasury rate was the rate most commonly used in prepayment premium clauses because it is the most reliable rate, that it is easily verifiable and that it is consistently and predictably published." Id.

CP Holdings' challenges the Bankruptcy Court's Order overruling its objection to CALPERS' claim for the prepayment premium on three grounds. First, CP Holdings contends that the Bankruptcy Court erred in its finding that CP Holdings became obligated to remit a prepayment premium following acceleration of the Note because the formula for calculating the prepayment premium requires actual prepayment and CP Holdings has not repaid any of the debt owed under the Note since acceleration.

4

Second, CP Holdings argues that the prepayment premium formula is not a valid and enforceable liquidated damages clause under state law because it fails to "reasonably forecast" CP Holdings actual damages in the event of acceleration as the formula uses the yield on a ten-year Treasury issue rather than the higher rate associated with commercial first-mortgage loans in calculating the reinvestment yield. Finally, CP Holdings asserts that the prepayment premium should be disallowed pursuant to Bankruptcy Code § 506(b) because it is not "reasonable" and CALPERS has not suffered actual damages.

## II.     Jurisdiction

CP Holdings filed a timely notice of appeal from a final order of the United States Bankruptcy Court for the Western District of Missouri. This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1).

## III.    Standard of Review

The Bankruptcy Court's construction of the terms of the promissory note and their legal effect are questions of law subject to de novo review. *See* Arkansas Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc., 797 F.2d 565, 567 (8th Cir. 1986) ("It is well settled that the construction and legal effect of a contract are questions of law subject to de novo review."); Towers Hotel Corp. v. Rimmel, 871 F.2d 766, 770-71 (8th Cir. 1989) ("To the extent the district court's construction of the [settlement agreement] and its legal effect relies on the contract terms . . . its interpretation is a conclusion of law over which we have plenary review."). However, to the extent that the Bankruptcy Court's interpretation of the promissory note relies upon disputed extrinsic evidence, this Court will apply a clearly erroneous standard. *See* Arkansas Rice Growers, 797 F.2d at 567 ("To the extent that the meaning of the contract depends on disputed extrinsic evidence, however, it constitutes a finding of fact, subject to review on appeal under the

5

clearly erroneous rule"); Towers Hotel, 871 F.2d at 770-71.

A "clearly erroneous" finding of fact is more than simply "possibly wrong" or even "probably wrong." In re Papio Keno Club, Inc., 262 F.3d 725, 729 (8th Cir. 2001). Rather, under the clearly erroneous standard the Court must have a "definite and firm conviction that a mistake has been committed" before overturning a finding of fact supported by evidence in the record. Willis v. Henderson, 262 F.3d 801 (8th Cir. 2001). The Eighth Circuit has noted that a "clearly erroneous" factual finding strikes the Court as wrong "with the force of a five-week-old, unrefrigerated dead fish." Id. *quoting* Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988).

**IV.    Discussion**

  ***A. The Bankruptcy Court did not err in its finding that CP Holdings became obligated to remit a prepayment premium to CALPERS following acceleration of the Note.***

CP Holdings begins by arguing that the Bankruptcy Court erred in its interpretation of the prepayment premium provision included in the Note. (Doc. #5). CP Holdings claims that "the prepayment premium clause unambiguously provides that no prepayment premium is due absent a prepayment of the Note and the receipt by the lender of prepaid proceeds." Id. CP Holdings concedes that the Note was accelerated. Id. However, CP Holdings contends that it is not required to pay the prepayment premium because there has been no actual prepayment as it has not repaid any of the debt owed under the Note following acceleration. Id.

The Bankruptcy Court ultimately found that the language of the Note was clear. (Doc. #212, Bankr. Case No. 03-60942). Judge Federman stated in the hearing:

 . . . if I look at the language in the middle of page 2 of Exhibit #1 (the Note) and take out

> the superfluous language that really isn't applicable to this situation, it reads that the undersigned agrees that if the holder of this note accelerates the whole of the principal sum evidenced hereby, the undersigned waives any right to prepay said principal sum in whole or in part without premium and agrees to pay a prepayment premium. And it seems to me that that language is clear . . .

This Court agrees with Judge Federman that it is clear on the face of the Note that CP Holdings' obligation to remit a prepayment premium to CALPERS attached at the time CALPERS accelerated the Note.

The Note further provides the formula for calculating the prepayment premium. Pursuant to the Note, the prepayment premium is either: (a) the greater of one percent of the principal balance; or (b) the reinvestment yield minus the present value of the mortgage. In its proof of claim, CALPERS applied the reinvestment yield formula to calculate the prepayment premium. CALPERS began by determining that the reinvestment yield was 3.875% – the yield of a ten-year Treasury issue published on March 31, 2003.[3] CALPERS calculated the reinvestment yield as of March 31, 2003 because this date was "two weeks prior to the date of acceleration."

However, the Court notes that the formula for calculating the prepayment premium provides that the "Reinvestment Yield will be equal to the yield on the U.S. Treasury Issue . . . published two weeks prior

---

[3]CALPERS asserted in the hearing that it used 3.875%, the yield on a ten-year February 13th Treasury published on March 31, 2003 in the Wall Street Journal, to calculate the reinvestment yield. (T 144/14-20). The Court confirmed this calculation by analyzing historical data provided by the Federal Reserve. *See* http://www.federalreserve.gov/releases/h15/data.htm According to the Federal Reserve, the yield on a ten-year Treasury issue on February 13, 2003 was 3.89%. Id. The yield on a ten-year Treasury issue on March 31, 2003, two weeks prior to the date of acceleration, was 3.83%. Id. CALPERS calculated the penalty based on the published yield of a ten-year Treasury on February 13, 2003, approximately two months prior to the date of acceleration. However, the argument that the prepayment premium should be disallowed because CALPERS failed to use the proper yield on a ten-year U.S. Treasury when calculating the reinvestment yield was not presented to this Court. Therefore, it will not be considered.

7

to the date of prepayment." In the hearing, CALPERS' expert, Patrick A. Randolph, Jr., testified on direct examination that a lender includes a prepayment premium clause in the loan to protect itself in the event the borrower defaults, the balance due on the note is accelerated, and the lender loses an anticipated income stream in the form of lost interest payments. (Hr'g Tr. 15:17-16:2; 23:6-24:21; 25:20-26:6). Randolph stated:

> I believe the purpose [of prepayment premiums] to be to protect the lender from the cost that would be associated with the termination of its income stream that obviously would occur when the borrower defaults and the lender has concluded the borrower simply isn't going to resume payment which is the occasion upon which the lender elects to accelerate. And so that is the moment in time that the lender actually is going to face up to the fact its not going to be paid. That's what acceleration is. And so that's when this prepayment premium is triggered.

(Hr'g Tr. 25:20-26:6). Therefore, according to Randolph, the date of acceleration should be used, rather than the date of prepayment, in calculating the reinvestment yield because the date of acceleration is when the lender actually begins to lose its income stream and the purpose of the prepayment premium is to replicate the lender's lost income stream for the balance of the life of the loan.

On cross-examination, Randolph was questioned about the portion of the prepayment penalty formula which provides that the reinvestment yield is calculated by first determining "the yield on the U.S. Treasury Issue . . . published two weeks prior to the date of *prepayment*" (emphasis added). Randolph testified that he did not find the clause to be ambiguous and that the word "acceleration" should have been used instead of "prepayment." (Hr'g Tr. 53:13-19). Randolph provided the following explanation:

> Because in this case the prepayment premium is as payable upon acceleration. And to the extent that this possibly would lead somebody like you to later question whether they actually intended to mean two weeks prior to the acceleration, I think it would have been safer to say acceleration. I think the language – obviously the intent of the language is to treat acceleration as the moment of prepayment when there's been an acceleration rather

8

than a[n] involuntary prepayment.

(Hr'g Tr. 53:21-54:4). Randolph proceeded to testify that if he had written the clause he wouldn't have substituted "acceleration" for "prepayment," but rather "would have phrased it even more broadly to say – to incorporate both concepts." (Hr'g Tr.54:5-9). Randolph did concede that in "other contexts" the terms "acceleration" and "prepayment" are not used interchangeably and the Note contains no "express statement" that the words "acceleration" and "prepayment" are to be used interchangeably. (Hr'g Tr. 54:10-13, 55:3-7).

The Bankruptcy Court overruled CP Holdings' objection to CALPERS proof of claim without discussing the language of the prepayment premium formula. The Bankruptcy Court's ultimate conclusion suggests that it was persuaded by Randolph's testimony that the parties intended the date of acceleration, rather than the date of prepayment, to be used to calculate the reinvestment yield. Accordingly, the portion of the Bankruptcy Court's decision which allows CALPERS claim for a prepayment premium in the amount of $2,651,547.69 is based on Randolph's testimony about the purpose of the prepayment premium and the parties' intent in permitting CALPERS to recover a prepayment penalty upon acceleration and will not be disturbed absent clear error.

The Court does not have a definite and firm conviction that the Bankruptcy Court erred in determining that, based on Randolph's testimony, CALPERS was entitled to a prepayment premium, calculated by reference to the date of acceleration rather than the date of prepayment. According to Randolph, the parties contractually agreed to a prepayment premium that was intended to protect CALPERS' loss of interest income in the event CP Holdings defaulted and the Note was accelerated. "The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect

9

to that intent." Lacy v. State Bd. of Registration for the Healing Arts, 131 S.W.3d 831, 838 (Mo. App. W.D. 2004) *quoting* Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995) (en banc). Accordingly, the Bankruptcy Court did not clearly error by considering the intent of the parties when construing the terms of the Note.

The Bankruptcy Court's decision to permit CALPERS to recover a prepayment premium calculated with reference to the date of acceleration, rather than the date of prepayment, is further supported when the Note and the mortgage instruments are viewed in their entirety. "In determining the intent of the parties to a contract, we review the terms of a contract as a whole, not in isolation." Id. *quoting* Tuttle v. Muenks, 21 S.W.3d 6, 11 (Mo. App. W.D. 2000). The terms of a contract are to be read as a whole, and each term construed to avoid an effect which renders other terms meaningless. State ex rel. Missouri Highway & Transp. Comm'n v. Maryville Land Partnership, 62 S.W.3d 485, 492 (Mo. App. 2001). "A construction attributing a reasonable meaning to each phrase and clause, and harmonizing all provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." Id.

The Note provides that CP Holdings becomes obligated to pay a prepayment premium upon acceleration of the Note. The mortgage instruments expressly provide that in the event of default:

> the whole of said principal sum hereby secured shall, at the option of the Beneficiary and without further notice to Trustor, become immediately due and payable together with accrued interest thereon and a prepayment premium calculated in accordance with the provisions of Paragraph 11 hereof, and whether or not Beneficiary has exercised said option, interest shall accrue on the entire principal balance and any interest or premium then due at the Default Rate until fully paid or if the Beneficiary has not exercised said option, for the duration of any Event of Default.

(Debtor's Ex. #10). CP Holdings' contention that it is not obligated to remit a prepayment premium

following acceleration in the absence of actual prepayment is irreconcilable with this provision in the mortgage instrument on two grounds. First, the mortgage instrument provides that "interest shall accrue on the entire principal balance and any interest or premium then due at the Default Rate until fully paid." If the prepayment premium were calculated on the date of prepayment, it would be impossible for interest to accrue on the unpaid prepayment premium between the date of acceleration and the remittance of the prepayment premium, rending this provision of the mortgage instrument "meaningless."

Furthermore, the mortgage instrument provides that upon default, the principal balance "becomes immediately due and payable [i.e., accelerated] together with accrued interest thereon and a prepayment premium." The prepayment premium could not become immediately due at the time of acceleration if it was incapable of being calculated at that time. If the date of acceleration was not used to calculate the prepayment premium, the prepayment premium could not become "immediately due and payable" at the time of acceleration, rendering this provision of the agreement "without function or sense." The Bankruptcy Court's implicit finding that the prepayment premium should be calculated by reference to the date of acceleration, rather than the date of prepayment, harmonizes the Note and the mortgage instruments.

The Bankruptcy Court's implicit finding that the date of acceleration, rather than the date of prepayment, should be applied to determine the prepayment premium is further supported by caselaw. According to one bankruptcy court,

> Acceleration is often treated as a prepayment because it is generally followed by a forced or consensual sale of the collateral or by a refinance of the debt and a payoff. In some fashion, after the acceleration, the borrower is taken off the loan and the lender does not receive the stream of payments for which it contracted.

In re Hidden Lake Limited Partnership, 247 B.R. 722, 728 (S.D. Ohio 2000). As the acceleration resulted

11

in CALPERS losing the stream of interest payments for which it has contracted, the Bankruptcy Court did not err in finding that the date of acceleration may be properly used for calculating the reinvestment yield where there has been no prepayment.

This Court agrees with the Bankruptcy Court's finding that the language of the prepayment premium clause clearly provides that CP Holdings' obligation to remit a prepayment premium to CALPERS attached at the time CALPERS accelerated the Note. CP Holdings failed to prove that the Bankruptcy Court clearly erred in relying on Randolph's testimony about the purpose and corresponding intent of the parties when construing the prepayment premium clause included in the Note. Randolph's testimony that the parties intended the date of acceleration, rather than the date of prepayment, to be used to calculate the prepayment premium is supported by the mortgage instrument's provision relating to default and the decisions of other bankruptcy courts.

> **B.** *The Bankruptcy Court did not err in finding that the prepayment premium clause included in the Note is a valid liquidated damages provision under applicable state law.*

CP Holdings argues that the Bankruptcy Court also erred in finding that the prepayment premium clause was a valid liquidated damages provision under applicable state law because the prepayment premium formula is not a "reasonable forecast" of damages as it relies on the yield on a U.S. Treasury issue, rather than the higher rate of interest on commercial first-mortgage loans, thereby providing for a higher prepayment penalty that is not commensurate with actual damages.

In Missouri, the general rule is that liquidated damages clauses are valid and enforceable, while penalty clauses are not. Paragon Group, Inc. v. Ampleman, 878 S.W.2d 878, 880 (Mo. App. 1994). "Liquidated damages are a measure of compensation which, at the time of contracting, the parties agree

12

shall represent damages in case of breach." Paragon, 878 S.W.2d at 880. Contrarily, penalty clauses represent punishment for breach. Id. For a liquidated damages clause to be valid and enforceable in Missouri: "(1) the amount fixed as damages must be a reasonable forecast for the harm caused by the breach; and (2) the harm must be of a kind difficult to accurately estimate." Id. at 881 *citing* Restatement (First) of Contracts § 339 (1932) and Restatement (Second) of Contracts § 356 (1979). The Court must consider whether the amount fixed as damages was a reasonable forecast for the harm cased by the breach "at the time of the making of the contract, even though it may not approximate the actual loss." Comment (b) of Restatement (Second) of Contracts § 356.

> *1.  The prepayment premium formula was a reasonable forecast of the potential harm caused by acceleration.*

The Bankruptcy Court found that "the prepayment premium is provided for under the parties' agreement, and that, based on the testimony offered, it was a reasonable estimate of the damages to be suffered in the event CALPERS lost the benefit of its bargain due to default." (Doc. #212, Bankr. Case No. 03-43750). The Bankruptcy Court noted that evidence presented at the hearing supported its finding:

> Both expert witnesses testified that the formula for calculating the premium was reasonably related to the anticipated loss CALPERS would sustain in the event of default, and that the United States Treasury rate was the most commonly used in prepayment premium clauses because it is the most reliable rate, that it is easily verifiable and that it is consistently and predictably published.

Id. This Court agrees with Judge Federman's conclusion that the formula for calculating the prepayment premium included in the Note is a valid liquidated damages clause under applicable state law.

In the hearing, CP Holdings' expert witness, Christopher C. Pflaum ("Pflaum"), testified on cross-examination that prepayment premium clauses are "common" in the commercial lending industry and

13

characterized the prepayment premium clause in the present case as "plain vanilla." (Hr'g Tr. 90:11-14, 19-23). Pflaum further testified that there are only slight differences among the various formulas commonly used to calculate prepayment premiums and "the most common formula requires the borrower to pay the net present value of the future cash flows from the mortgage loan discounted at a rate equal to the yield of the Treasury Bond with the same average life as the loan." (Hr'g Tr. 90:15-18, 91:1-6). Pflaum testified "that it would be unlikely in 1989 that CP Holdings would have gotten a $12 million loan like this one without such a clause" and if they had "there would have been a cost for that, whether by interest rate or extra points or some other term." (Hr'g Tr. 91:20-92:5). Finally, Pflaum stated in his deposition and again at the hearing that the prepayment clause was not unreasonable: "There's nothing unreasonable with this prepayment clause to influence the behavior of a borrower not to refinance." (Hr'g Tr. 92:6-12).

CALPERS' expert witness, Randolph, testified in the hearing that the prepayment clause in the present case is similar to prepayment clauses "quite commonly" used in the industry in 1989. (Hr'g Tr. 30:1-5). Randolph further testified that, based on his education and expertise, the prepayment clause contained in the Note "is a reasonable attempt on the part of the parties in 1989 to protect the lender in a reasonable fashion from really our [sic] uncertain risks of being able to replace its income stream upon acceleration." (Hr'g Tr. 30:9-12). Randolph testified that use of the Treasury yield to calculate the prepayment premium was reasonable because the Treasury yield is a "stable and relatively secure rate:"

> I think that there may be times when the Treasury rate is perhaps closer or further away from that of the yield on very, very high-grade commercial loans. I don't think anybody would question that the Treasury rate is a very good rate for the lender. On the other hand, the lender has been exposed to a number of uncertain costs. And so we're interested in making certain that the lender is able to recoup the costs that it will incur in

14

> making a new loan and – or pardon me – in replacing the income stream. And in order to do that, we have to come up with a stable and relatively secure rate that makes it clear that the lender is not going to be engaged in, involved in possibly an expensive search to find the exact, precise, replacement investment opportunity . . . if you're trying to forecast as a means of – in the form of what basically is called the liquidated damages clause, what your losses are going to be in twenty years hence, it's very difficult to know other than with the Treasury rate exactly what it is you're trying to find as a replacement investment. There may be no commercial mortgages similar to the one that is at stake here.

(Hr'g Tr. 30:17-31:1-6, 31:19-32:1).

The Court finds that the Bankruptcy Court's holding that the prepayment premium clause included in the Note is a valid and enforceable liquidated damages clause under applicable state law is amply support by the evidence. Based on the prevalence of the formula, both experts testified that the prepayment premium clause included in the Note was "common," this Court can infer that it was a fair and reasonable forecast of the harm anticipated by a breach at the time of contracting. Furthermore, both experts testified that the prepayment premium clause was "reasonable." CP Holdings' expert testified that it was reasonable because it wouldn't "influence the behavior of the borrower not to refinance." CALPERS expert testified that the prepayment premium clause was a "reasonable attempt . . . to protect the lender in a reasonable fashion" from the uncertain risks of replacing its lost income stream. Accordingly, this Court finds that the prepayment premium clause was a reasonable forecast of the harm anticipated by acceleration at the time of contracting.

CP Holdings argues that the prepayment premium formula is not a reasonable forecast of the damages caused by acceleration because the lender's reinvestment yield is calculated by using the yield on a U.S. Treasury issue. At the hearing Pflaum argued that the reinvestment rate on similar loans, i.e. commercial first-mortgage loans, was 6.5%, much higher than the 3.875% yield on the ten-year U.S.

15

Treasury issue that was used to calculate the prepayment premium. (Hr'g Tr. 76:18-24, 83:10-21). Pflaum testified that if the parties had contractually agreed to use the interest rate available on commercial first-mortgage loans, the prepayment premium would be reduced to $1.25 million. Id. Therefore, CP Holdings argues that the prepayment premium formula is not a reasonable forecast of damages because a closer approximation of actual damages would have been obtained by using the interest rate available on commercial first-mortgage loans.

The Court rejects CP Holdings' argument that the interest rate on commercial first-mortgage loans should be used when calculating the reinvestment yield, rather than the yield on a U.S. Treasury issue, for two reasons. First, this substitution would be offensive to the basic notion of freedom of contract as the parties agreed that the yield on a U.S. Treasury issue would be used to calculate the reinvestment yield. CP Holdings and CALPERS, two "sophisticated and experienced business parties," contracted to have the prepayment premium calculated using the yield on a U.S. Treasury issue. (Hr'g Tr. 132:20-143:2; 138:7-140:1). The Court, in deference to long-standing principles of contract law, declines CP Holdings' request to impermissibly rewrite the contract in contravention of the parties bargained-for agreement.

Second, the testimony of both experts supports a finding that the use of the yield on a U.S. Treasury issue to calculate the reinvestment yield is reasonable. Randolph, CALPERS expert, testified that the yield on a U.S. Treasury issue provides a stable and relatively secure interest rate. Pflaum, CP Holdings' expert, recognized that "only Treasury instruments are absolutely default free," can be "move[d] . . . with the press of a button," "are held as reserve by central banks," and are used "to develop and structure financial derivatives." (Pflaum Test. 84:19-85:3). Accordingly, the parties made a reasonable attempt to forecast the damages anticipated by acceleration by using the yield on a U.S. Treasury in the

16

prepayment premium formula because such an investment is safe, easy to obtain and provides a relatively stable and secure rate of return.

### 2. *The harm caused by acceleration is difficult to estimate.*

Under the second step of the test for a valid liquidated damages clause, this Court finds that it was difficult for the parties to "accurately estimate" their potential damages in the event of acceleration. It is difficult to make an exact calculation of potential losses in the event of acceleration due to significant variables such as the loan amount, the term remaining, and the interest rate available at the time of acceleration. *See* Hidden Lake, 247 B.R. at 726. "It is also difficult to know if a suitable reinvestment vehicle will be available." Id. "Although many of the factors which are difficult to ascertain at the time a loan is entered into would be more certain if evaluated at the time of default or prepayment, the pricing of any reinvestment loan would not be known until such a loan was closed." Id. at 726-27. At the hearing, both experts testified that it is extremely difficult for a long-term lender to predict what its losses will be in the event of an acceleration after default due to a variety of factors including changing market conditions. (Hr'g Tr. 16:3-10; 17:17-18:9; 102:14-106:12; 110:2-5). Accordingly, the liquidated damages clause is valid and enforceable under applicable state law because the harm caused by acceleration was difficult for the parties to accurately estimate at the time of contracting.

### C. *CP Holdings has failed to prove that the Bankruptcy Court erred by determining that the Bankruptcy Code § 506(b) standards do not apply in this case.*

CP Holdings' final argument is that the Bankruptcy Court erred by determining that the requirements of Bankruptcy Code § 506(b) do not apply to the prepayment premium clause included in the Note. Addressing CP Holdings' argument that the prepayment premium clause had to be "reasonable"

17

pursuant to Bankruptcy Code § 506(b), the Bankruptcy Court held, "Section 506(b) of the Code . . . is only relevant for determining the amount of a claim post petition." (Doc. #212, Bankr. Case No. 03-43750). Because the Bankruptcy Court properly concluded that the prepayment premium became due and owing at the time of acceleration, two months prior to the bankruptcy filing, the prepayment premium became part of CALPERS' claim prior to the bankruptcy filing. Therefore, Bankruptcy Code § 506(b) does not apply to CALPERS' prepayment premium claim.

Various bankruptcy courts interpreting the plain language of Bankruptcy Code § 506(b) have concluded that it applies only to claims for fees, costs or other charges accrued post-petition. *See* In re Leatherland Corp., 302 B.R. 250 (Bankr. N.D. Ohio 2003) (discussing and rejecting the application of § 506(b) to pre-petition fees); In re Vanderveer Estates Holding, 283 B.R. 122, 131 (Bankr. E.D. N.Y. 2002) ("[Section] 506(b) permits a secured creditor to recover post-petition interest, and reasonable post-petition fees, costs, or charges provided for under the relevant agreement, to the extent of the value of the collateral securing the claim. Interest, fees, costs and charges arising pre-petition are part of the secured creditor's claim in the first instance and are therefore not governed by § 506(b)."); In re Cummins Utility, L.P., 279 B.R. 195, 201 (Bankr. N.D. Texas 2002) (finding that § 506(b) applies only to post-petition fees and "pre-petition interest and fees are allowable (if at all) as part of the underlying secured claim.").

CP Holdings' has not cited to a single case holding that a prepayment premium that is due and payable prior to the filing of a bankruptcy petition is subject to the provisions of Bankruptcy Code § 506(b). Instead, CP Holdings has cited to a handful of cases discussing post-petition claims for attorney fees incurred pre-petition. Those case are factually distinguishable from this case involving a prepayment

18

premium that had accrued almost two months prior to CP Holdings' bankruptcy petition. Accordingly, this Court finds that the Bankruptcy Court correctly concluded that Bankruptcy Code § 506(b) does not apply to CALPERS' prepayment premium claim and the Bankruptcy Court's decision is affirmed.

## V.     Conclusion

The Court finds that the language of the Note clearly provides that CP Holdings' obligation to remit a prepayment premium to CALPERS attached at the time the Note was accelerated. The Bankruptcy Court did not clearly err in relying on Randolph's testimony to conclude that the date of acceleration, rather than the date of prepayment, should be used to calculate the prepayment premium. Ample evidence exists in the record to support the Bankruptcy Court's finding that the harm caused by acceleration was difficult to estimate at the time the Note was drafted and the prepayment premium clause served as a reasonable forecast of damages in the event of acceleration; therefore, the prepayment clause is a valid and enforceable liquidated damages clause under applicable state law. Finally, the Bankruptcy Court did not err in declining to apply the standards of Bankruptcy Code § 506(b) to the prepayment premium because the prepayment premium became part of CALPERS' claim prior to the bankruptcy filing.

Accordingly, The Bankruptcy Court's Order overruling CP Holdings' objection to CALPERS' claim for the prepayment premium is AFFIRMED.

**IT IS SO ORDERED.**

    /s/ Gary A. Fenner
    GARY A. FENNER, JUDGE
    United States District Court

DATED:   September 30, 2005

19

Case 4:04-cv-00635-GAF   Document 11   Filed 09/30/05   Page 19 of 19